# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs July 10, 2012

## STATE OF TENNESSEE v. JURICO READUS

**Appeal from the Criminal Court for Shelby County**
**No. 06-06163      Carolyn Wade Blackett, Judge**

---

**No. W2011-01544-CCA-R3-CD  - Filed January 16, 2013**

---

A jury convicted the defendant, Jurico Readus, of one count of first degree (felony) murder of Luis Reyes Hernandez, and two counts of attempted especially aggravated robbery, class B felonies.  The trial court merged the count of attempted especially aggravated robbery of Luis Reyes Hernandez with the first degree (felony) murder conviction, for which the defendant received a life sentence.  The defendant was sentenced to serve ten years, concurrently with his life sentence, for the attempted especially aggravated robbery of Jary Reyes.  On appeal, the defendant challenges the sufficiency of the evidence underlying his convictions and the voluntariness of his confession which was obtained while he was a juvenile.  After a thorough review of the record, we conclude that there was no reversible error and affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, J.J., joined.

Stephen Bush, District Public Defender; Clifford Abeles and Sanjeev Memula, Assistant District Public Defenders, at trial; and Phyllis Aluko, Assistant District Public Defender, on appeal, for the appellant, Jurico Readus.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Paul Goodman and Glenda Adams, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Factual History

On March 19, 2006, the victims, Luis Reyes Hernandez and his nephew, Jary Reyes, were approached by two men who demanded their money. Both victims were shot when a struggle ensued, and Mr. Hernandez was killed. The sixteen-year-old defendant gave a statement to police in which he confessed his involvement with the crimes. The defendant and his cousin, Toddreck Watts, who also received a gunshot wound that day, were charged with the crimes and tried separately.

Prior to trial, the defendant moved to suppress the statement he had given to the police. Sergant Connie Justice, of the Memphis Police Department testified that the defendant first came to the attention of police when Sergeant Justice went to the hospital to interview the surviving victim and noticed a young man with a gunshot wound being dropped off and admitted to the hospital. She determined that the young man, the co-defendant, had been shot in suspicious proximity to the shooting which she was investigating. The co-defendant's mother then brought the defendant to the hospital, and Sergeant Justice spoke with him briefly at around 11:00 or 11:30 a.m. regarding who he was and what had happened to his cousin, the co-defendant. The defendant's parents, who had been at church, arrived at the hospital, and Sergeant Justice told them that the police "needed to speak with him and it needed to be at our office."

Sergeant Justice and a uniformed police officer drove the defendant to the police station, and the defendant's parents followed in their car. At the police station, the defendant was placed in a room alone and shackled to a bench, as was "customary" policy in the department. Sergeant Justice told the defendant's parents that they should discuss whether they would allow police to interview the defendant. While other witnesses were being interviewed, the defendant's parents made the decision to let police speak with their son. Sergeant Justice testified that the defendant was never interviewed at the police station without his parents present. At 4:23 p.m., the defendant was presented with an advice of rights form which he was asked to partially read aloud in order to determine whether he was literate. The defendant and his step-father both read and signed the form. The police then questioned the defendant with his step-father present, and the defendant told police a version of events which differed from his prior version in the location of the co-defendant's shooting. The police left the room and spoke with the defendant's step-father, who said he would advise the defendant to tell the truth. The defendant, with his mother and step-father both in the room, gave a statement confessing to shooting the victims in the course of attempting to rob them. The statement was started at 6:08 p.m. and preceded by an advice of rights. Sergeant Justice testified that the defendant and his parents were not promised anything, threatened, coerced, or pressured. On cross-examination, Sergeant Justice clarified that when she spoke with the defendant at the hospital regarding his cousin's injury, the location he

gave for the shooting did not match that given by his cousin. She stated that the uniformed officer who accompanied her rode in the back with the defendant when he was taken to the police station.

The defendant testified at the suppression hearing that he was sixteen years old at the time of the crime and that he had never been questioned by the police. He testified that Sergeant Justice spoke to him for approximately five minutes at the hospital and asked him about the homicide. He testified that she informed him he would be taken to the homicide office and that he did not feel free to leave. He was left shackled in a room for "a couple" of hours during which he had no contact with anyone and was not offered food, drink, or the use of the restroom. He testified that Sergeant Justice then questioned him for ten minutes alone regarding the homicide. The defendant stated that he was then questioned further with his step-father in the room and that he was not given an advice of rights at this point. He testified that he was given the opportunity to speak with his step-father without police present. However, he testified that he was not given his advice of rights form until after he had given a statement admitting guilt, and that he only signed the advice of rights because he felt he had "already told them what happened." He did not understand his right to remain silent or right to an attorney and stated he would not have given a statement if he had been advised of his rights. On cross-examination, the defendant stated he had also not been advised of his rights during either of two prior incidents in which he was arrested for assault and disorderly conduct. He acknowledged that his statement was accurate, that it had been taken in the presence of a parent, that he had read it before he signed it, and that he had not been threatened or promised anything in exchange for giving it.

The trial court denied the motion to suppress, finding that the defendant had been advised of his rights when the custodial interrogation was begun and that he had knowingly and voluntarily waived his rights. The trial court found that the defendant had been advised of his rights twice before giving the statement. The trial court further found that there was probable cause to arrest the defendant when he was taken to the police station, although it concluded that the defendant was not under arrest at the time, that he "voluntarily went to the police station," and that his shackled leg "was merely customary and police policy." The trial court concluded the confession would be admissible at trial.

At trial, the State first presented the testimony of Adrian Triplett, an officer with the Memphis Police Department who was first to respond to the shooting between 10:05 and 10:08 a.m. Officer Triplett found two men shot, and he called an ambulance and secured the scene. Rickey Davidson, a crime scene investigator, documented the scene of the shooting. Officer Davidson tagged as evidence six .40 caliber bullet casings and four fragments from the scene and one bullet from The Med. He testified he also found a baseball cap, a red towel, and twenty-seven cents lying on the ground. There was also a live round, which

Officer Davidson testified could have been ejected from a weapon if a round was already chambered and someone attempted to cock or charge the weapon. He testified that the deceased victim had his wallet, which contained $110.18 as well as some foreign currency. There was also a money order for sixty-seven dollars in the deceased victim's shirt pocket.

A. J. Pounds, another crime scene investigator with the Memphis Police Department, testified that at 8:12 p.m., he found a .40 caliber semiautomatic pistol in a closet on top of some shoes at the co-defendant's home. On cross-examination, he acknowledged having performed a gunshot residue test on the defendant and he acknowledged the weapon had not been fingerprinted. On re-direct examination, he testified that the test was performed at 3:18 p.m., and that he did not know if the defendant had washed his hands between the time of the test and the time of the crime.

James Currin, who was the case coordinator, testified that he submitted to the Tennessee Bureau of Investigation one gunshot residue test from the defendant; one live .40 caliber bullet; six .40 caliber shell casings; four bullet fragments; one bullet recovered from the co-defendant and one from the surviving victim; and a .40 caliber handgun. Officer Jackson Ngien testified to having tagged the bullet recovered from the co-defendant.

Karen Chancellor, the chief medical examiner for Shelby County, performed the autopsy of the deceased victim and testified that he died as a result of being shot twice in the head during a homicide. She testified that only one shot was fatal, that an absence of sooty residue indicated he had been shot from more than three feet away, and that the victim's urine contained a metabolite of cocaine.

Sergeant Justice's testimony was substantially the same as it had been at the suppression hearing. Sergeant Justice gave more detail regarding the timing of events, testifying that she arrived at the hospital at 10:25 a.m., that the defendant's parents arrived at noon, and that the defendant was transported to the station at 12:21p.m., where he was joined by his parents at 12:45 p.m. She testified that he was offered food, water, and the use of the restroom while he waited and that although his parents informed police they would permit officers to interview the defendant a little after two o'clock, officers did not enter the room until 4:20 p.m. At that time, the defendant was advised of his rights. Sergeant Justice testified that the officers left the room around 4:40 p.m. and came back fifteen minutes later, at which point they informed the defendant that they knew he was lying and that he had been identified by witnesses. At 5:15 p.m., after the defendant's step-father had informed police he would advise the defendant to tell the truth, the defendant was left alone with his parents. Sergeant Justice testified that the defendant told police he had shot his cousin by accident, but he never described the shooting of the victims as accidental. She stated that the

defendant informed police where he had left the weapon but told them he had asked the co-defendant's twin brother to hide it.

The defendant's statement was introduced into evidence. In his statement, the defendant admitted that he was responsible for the shooting. The defendant explained that he and his cousin saw the victims, and that he "pointed the gun and told them to give me everything out of their pockets." The defendant instructed his cousin to check the victims' pockets, and the surviving victim and co-defendant began "tussling." The surviving victim began to yell and "shots were fired." The defendant stated that he "accidentally" shot the co-defendant and shot twice at one victim and three times at the other. He stated that neither he nor the co-defendant took property from the victims. The defendant explained that they had gone to the apartments to "get some money" and further elaborated that he meant "[r]obbing Mexicans, getting some money." The defendant described where he had left the weapon at the co-defendant's house.

Shelly Betts from the Tennessee Bureau of Investigation's firearms identification unit testified that she had received and test-fired the weapon. She testified that all of the casings at the scene had been fired from that weapon. Ms. Betts testified she was not able to say whether or not any of the fragments, including those recovered from the co-defendant, were fired from that weapon; however, she was able to match a jacketed bullet recovered from the surviving victim to the weapon. Ms. Betts testified that the live bullet was made by a different manufacturer but that it would be possible to load the magazine with bullets of varying manufacture as long as they were all .40 caliber. She testified that no gunshot residue was found on the defendant but that the absence of residue did not eliminate the possibility that he fired the gun.

Nora Reyes Hernandez, the deceased victim's sister, testified through an interpreter that the deceased victim had been searching for an apartment. The day before the shooting, he had given her $1,200 to keep for him, but he had ultimately changed his mind and taken the money with him. After the shooting, Ms. Hernandez searched all over the deceased victim's apartment but was unable to find the money. Ms. Hernandez testified that she heard the shooting. She was in her apartment when she heard two shots fired, and she saw one assailant shooting the last shot at her nephew, the surviving victim. Her brother was still alive when she approached him, and two tears spilled from his eyes as he asked her to take care of his children.

The surviving victim testified through an interpreter that he had seen his assailants in the neighborhood prior to the shooting. He testified that his uncle was in the car when the defendant, who was pointing a gun at both him and his uncle, told his uncle to move to the other side of the vehicle. He testified that both he and his uncle had their hands raised and

did not resist the robbers. He testified that the assailants did not demand his money, but they did demand his uncle's money. However, he also testified that he could not understand English well and that he nevertheless understood through context that they wanted to rob him. He testified that "money, that was what they wanted[,] to rob, to steal." The surviving victim testified that he was walking backwards with his hands up and that as the co-defendant approached him, he expected the co-defendant to take his money. The co-defendant instead hit him, and the surviving victim "jumped on top of" the co-defendant. During the struggle, he heard two or three shots and saw his uncle fall; the defendant then shot at him more than five times, and he was hit by five of those bullets. The surviving victim testified he was conscious the entire time and that he was not robbed but he was unaware if anything was taken from his uncle. The surviving victim identified the defendant from a photographic array. He was shown fifteen to sixteen spreads before the one in which he identified the defendant.

The defendant did not testify or present proof. The jury convicted the defendant of felony murder and two counts of attempted especially aggravated robbery. The defendant moved for a new trial, asserting various grounds, and the trial court denied the motion. The defendant appeals, contending that the evidence was insufficient to support his convictions and that the trial court erred in denying his motion to suppress his statement.

**Analysis**

**I. Sufficiency of the Evidence**

Tennessee Rule of Appellate Procedure 13(e) requires the appellate court to set aside a conviction when the evidence is insufficient to support the finding of guilt beyond a reasonable doubt. In evaluating the sufficiency of the evidence, however, the appellate court does not ask itself whether it believes the evidence established guilt beyond a reasonable doubt, but instead determines whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318-319 (1979). On review, the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn from the evidence. *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). The trier of fact determines questions about the credibility of witnesses, the weight and value of evidence, and factual issues raised by the evidence, and the court

may not reevaluate or reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.* When the jury returns a guilty verdict approved by the trial court, a presumption of guilt replaces the presumption of innocence, and the appellant bears the burden of proving that the evidence was insufficient to support the verdict. *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). A criminal offense may be established by purely circumstantial evidence, and the State is under no obligation to exclude every reasonable hypothesis but the guilt of the defendant. *State v. Dorantes*, 331 S.W.3d 370, 379-81 (Tenn. 2011).

The defendant was convicted of two counts of attempted especially aggravated robbery and of first degree felony murder. Tennessee Code Annotated section 39-12-101 defines criminal attempt:

> (a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
>
> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.
>
> b) Conduct does not constitute a substantial step under subdivision (a)(3), unless the person's entire course of action is corroborative of the intent to commit the offense.

Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear, and theft is knowingly obtaining or exercising control over property without the owner's effective consent and with the intent to deprive the owner of property. T. C. A. § 39-13-401(a); T. C. A. § 39-14-103(a). Robbery becomes especially aggravated when accomplished with a deadly weapon and results in the victim's serious

bodily injury. T. C. A. § 39-13-403(a).

The defendant maintains that there is no evidence supporting the conclusion that he attempted to rob the surviving victim. The evidence at trial established that the defendant approached the two victims, pointed a gun at them, demanded the deceased victim's money, and then shot both victims when a struggle ensued after the co-defendant hit the surviving victim. Although the surviving victim testified that the defendant did not verbally demand his money, he also testified that he had a limited understanding of English, that he nevertheless understood from the context that the defendant wanted his money, and that he thought the co-defendant was approaching him in order to take his money. The statute contains no requirement that the robber reduce the attempt to exercise or obtain control over the property to a verbal demand. Furthermore, the defendant's own statement that his purpose in going to the apartment complex was "[r]obbing Mexicans, getting some money" and that he "pointed the gun and told them to give me everything out of their pockets" is sufficient to show that he intended to obtain or exercise control over the surviving victim's property, and the evidence shows that he completed a substantial step towards achieving that end. *State v. Webster*, 81 S.W.3d 244, 249 (Tenn. Crim. App. 2002) ("Accordingly, we find that the Defendant's conduct in approaching the victim and pointing a gun at the victim's head constituted a substantial step toward the commission of an especially aggravated robbery.").

Neither are we persuaded by the defendant's argument that both of the attempted especially aggravated robberies and the felony murder conviction resting on them must be overturned because the State did not show that the defendant had not, prior to the shooting, abandoned his intent to rob the victims or that the defendant had not "replaced" the intent to rob with an intent to defend himself and his cousin. Initially, we note that the defendant has not raised on appeal the trial court's refusal to instruct the jury on self-defense, and insofar as he alleges he acted in self-defense, his argument is waived. Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

Tennessee Code Annotated Section 39-13-202(a)(2) states that "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery" is first degree murder. The defendant cites no legal authority that his intent to rob the victims must have been present at the time he fired the weapon. In fact, "intent to commit the underlying felony must exist *prior to* or concurrent with the commission of the act causing the death of the victim." *State v. Buggs*, 995 S.W.2d 102, 107 (Tenn. 1999) (emphasis added). The killing may follow a felony and still be considered to have been committed "in the perpetration of" the felony, as long as there is a connection in time, place, and continuity of action. *State v. Pierce*, 23 S.W.3d 289, 294 (Tenn. 2000). The defendant's alleged failure to take property

after attempting to rob and after shooting the victims does not create a break in the time, place, or continuity of events such that the attempted robbery could not be the predicate felony for the first degree murder conviction.

The defendant's argument that he also cannot be convicted of the crimes because he did not take any property fails to distinguish between an attempted and completed crime. To show an attempted crime, the State only had to show that the defendant intended to accomplish the crime, that he had taken a substantial step towards completing the crime, and that the defendant's course of action was corroborative of the intent to commit the offense. We conclude that a rational trier of fact could have found that the defendant, who went to the apartment complex intent on "[r]obbing Mexicans," pointed a gun at the victims, demanded money, and then shot both victims, killing one, was guilty beyond a reasonable doubt of attempted especially aggravated robbery and felony murder committed in the perpetration of that attempted robbery. *State v. Webster*, 81 S.W.3d 244, 248-49 (Tenn. Crim. App. 2002) (concluding that evidence was sufficient to support convictions for first degree felony murder and attempted especially aggravated robbery when the defendant pointed a gun at the victim, demanded the victim's money, and fatally shot the victim when the victim resisted).

## II. Suppression of the Defendant's Confession

The defendant challenges the admissibility of his confession, contending that he did not, as the trial court found, knowingly and voluntarily waive his rights. A trial court's findings of fact in an order denying a motion to suppress are binding upon the appellate court unless the record preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). "[I]ssues of whether a defendant was placed in custody, interrogated, or voluntarily gave a confession are primarily issues of fact." *State v. Walton*, 41 S.W.3d 75, 81 (Tenn.2001). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. *Id.* Review of the trial court's application of law to the facts is de novo, with no presumption of correctness afforded the trial court. *State v. Talley*, 307 S.W.3d 723, 729 (Tenn. 2010).

Under both the Fifth Amendment to the United States Constitution and Article I, section 9 of the Tennessee Constitution, the accused has a right against self-incrimination. Statements made during a custodial interrogation and without the use of procedural safeguards may not be used by the prosecution in a subsequent trial. *State v. Blackstock*, 19 S.W.3d 200, 207 (Tenn. 2000). However, the rights afforded to the accused against self-incrimination may be waived "provided the waiver is made voluntarily, knowingly and

intelligently." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The Tennessee Constitution provides a stronger protection for individual rights in the test of voluntariness of confessions than the Fifth Amendment. *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996).

The trial court found that the defendant accompanied Sergeant Justice to the police station "voluntarily." Implicitly, then, the trial court found that the defendant was not in custody during the initial contact with Sergeant Justice at the hospital. The inquiry to determine whether a suspect was in custody focuses on whether a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest. *State v. Anderson*, 937 S.W.2d 851, 855 (Tenn. 1996).

> Some factors relevant to that objective assessment include the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

*Anderson*, 937 S.W.2d at 855.

These same factors are considered when the defendant is a juvenile. *See R.D.S. v. State*, 245 S.W.3d 356, 363-64 (Tenn. 2008). The defendant was questioned, by his own testimony, for approximately five minutes at the hospital during the morning hours. The trial court found that the questions established identifying information and information about the co-defendant's injury. The defendant was transported to the hospital by his aunt and questioned by one officer. There was no evidence that he was restrained or confronted with suspicions of guilt. There was no evidence, however, that he was made aware he was free to refrain from answering questions.

We conclude that the record does not preponderate against the trial court's finding that the defendant was not in custody at the hospital, as the defendant's freedom of movement was not curtailed to the extent associated with formal arrest. The defendant argues that he

did not feel free to leave; however, the test is an objective and not a subjective one. *Anderson*, 937 S.W.2d at 855. Because the defendant was not in custody during his initial contact with police at the hospital, *Miranda* warnings were not required. *R.D.S.*, 245 S.W.3d at 363.

The trial court, crediting Sergeant Justice's testimony that, at the police station, she did not question the defendant until after both he and his step-father had signed the advice of rights form, found that the defendant was informed about his rights prior to any custodial interrogation. Nevertheless, the defendant asserts that his waiver was not knowingly, intelligently, and voluntarily made due to his age; the fact that his parents were not at the hospital for the initial contact with police; his purported lack of consent to questioning; and the fact that his warnings did not explicitly state that he could stop answering questions at any time.

*Miranda's* prophylactic safeguards "must include warnings prior to any custodial questioning that an accused has the right to remain silent, that any statement he makes may be used against him, and that he has the right to an attorney." *State v. Blackstock*, 19 S.W.3d 200, 207 (Tenn. 2000). The defendant's advice of rights included these warnings, and the defendant cites no authority that additional warnings are constitutionally required.

In considering voluntariness, the essential question is "whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined." *State v. Downey*, 259 S.W.3d 723, 734 (Tenn. 2008) (quoting *State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980)). A juvenile's waiver of his Fifth Amendment rights is analyzed under the totality of the circumstances, considering the following factors:

> (1) consideration of all circumstances surrounding the interrogation including the juvenile's age, experience, education, and intelligence;
>
> (2) the juvenile's capacity to understand the *Miranda* warnings and the consequences of the waiver;
>
> (3) the juvenile's familiarity with *Miranda* warnings or the ability to read and write in the language used to give the warnings;
>
> (4) any intoxication;

(5) any mental disease, disorder, or retardation; and

(6) the presence of a parent, guardian, or interested adult.

*State v. Callahan*, 979 S.W.2d 577, 583 (Tenn. 1998).

The defendant was sixteen years old at the time of the waiver and was attending the ninth grade. He testified he had not been questioned by police prior to his interrogation in the instant case, although he had had prior involvements with law enforcement. The trial court found that the defendant possessed the requisite mental capacity to understand the warnings and consequences, and that he was able to read and write. There was no evidence of intoxication, mental disease or disorder, or retardation. The trial court found that a parent was present at all times during the defendant's interrogation, and the defendant was given the opportunity to consult his parents without police present. The trial court ultimately found that the defendant's waiver of rights was knowing and voluntary, and we conclude the record does not preponderate against this finding. Accordingly, we see no error in the denial of the defendant's motion to suppress.

## Conclusion

Because we conclude the evidence was sufficient to support the convictions and because we discern no error in the trial court's denial of the defendant's motion to suppress, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE

-12-